UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-156 (SRN/TNL)

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) **GOVERNMENT'S SENTENCING MEMORANDUM** |
| (4) MICHAEL ALLEN BURRELL | ) |
| Defendant. | ) |

The United States of America, by and through its attorneys, Lisa D. Kirkpatrick, Acting United States Attorney for the District of Minnesota, and Kristian Weir, Assistant United States Attorney, hereby submits this position paper as to sentencing factors. The government agrees with the guidelines calculation in the PSR, but respectfully requests that the Court sentence defendant Michael Allen Burrell to a term of 384 months, or 32 years. Such a sentence, while significant, is sufficient but not greater than necessary to achieve the goals of sentencing considering the seriousness of the defendant's involvement in the murder of Marcus Banks; the defendant's history and characteristics which include his years of criminal activities for and with the Bloods gang; and the need for sentencing to deter the Bloods' ongoing criminal enterprise in Minneapolis.

I. Introduction

Defendant Michael Burrell has been a lifelong member of the Minneapolis Bloods, committing gun violence and drug crime for and with the gang since at least 1999. He has been either in prison or on supervised release for two decades and his criminal activity has only escalated. Michael Burrell has spent his life committing violent crime and spreading poison in South Minneapolis. Michael Burrell caused the murder of Marcus Banks when he insisted on settling a score with an old gang rival at the Broadway Pub and Grille, personally starting the gunfight that claimed Banks's life. Yet the government can distinguish between Burrell and his co-defendants in this case, insofar as he did not directly murder either of the two shooting victims. His actions directly led to the murder of Marcus Banks, but there is plainly a difference between setting off the fight and shooting the fatal bullet. For that reason, the government is seeking a sentence of 32 years. Given Burrell's age, this would allow for his release at age 70 and give him some hope of living a reformed life outside of prison, albeit as an older man who is less of a threat to the community.

This sentence is still significant, but it is warranted by Burrell's criminal history, his involvement in the murder of a young man, his utter refusal to show remorse or take responsibility, and the collective damage done by the Bloods gang in its many years of criminal activity.

## II. The Bloods' Racketeering Conduct

The defendant was convicted of aiding and abetting premeditated murder in aid of the Bloods gang's racketeering enterprise. The Court has now heard substantial evidence of the nefarious impact of the Bloods gang on the South Minneapolis community, from their large-scale trafficking of deadly narcotics to the regime of violence they enforced to maintain their criminal territory. The defendant's sentence in this case must reflect the seriousness of the crimes committed by the Bloods gang and it must provide adequate deterrence to the entire enterprise.

### a. Indoctrination of children

The Bloods territory extends from Lake Street through the 30-block avenues of South Minneapolis. While the Bloods have wreaked havoc throughout the Minneapolis metro area, they have done the most damage to the community within their would-be kingdom. The impact of the Bloods gang within this community begins with their predation on its children. Bloods member William Blair testified that his tragic introduction to the Bloods gang occurred when he was just "10 or 11 years old," walking home from football practice. Jury Trial Transcript ("Trans.") at 228. As he walked home, the prepubescent William Blair unwittingly walked through a group of Bloods having "a meeting." *Id.* The adult Bloods members saw this as an insult and proceeded to beat the 10-year-old Blair. *Id.* at 229. Despite this cruel

introduction, Mr. Blair returned and continued to hang around with the Bloods, because he wanted "to have friends and people to kick it with." *Id.* at 230. The Bloods preyed on a child's desire for acceptance, turning him into a violent enforcer who spent the next several decades attacking rival gang members and assaulting Bloods members who broke the rules. *Id.* at 265-269; Gov't's Exhibit 194, "William Blair Plea Agreement."

Echoes of Mr. Blair's sad indoctrination into a violent enterprise resound in fellow Bloods member Jamal Rice's personal history. Mr. Rice testified that he was introduced to the gang as an eight-year-old hanging out at the local Boys and Girls Club. Trans. at 1344. Mr. Rice went to the Boys and Girls Club to "play basketball, shoot pool and just do…homework." *Id.* at 1345. Instead, he encountered Bloods members and was drawn to them, as they "were making money and everybody liked them, so I wanted to be just like them. *Id.* at 1344. Mr. Rice testified that he continued to hang out with the Bloods and "claim it": effectively commit small crimes on behalf of the gang to let the members and the community know he wanted to associate with them. *Id.* at 1346. This included graffiti, fighting, and shooting at rival gang members. *Id.* Finally, after years of "claiming it," Mr. Rice was "jumped in" at age 17 when several Bloods members abruptly assaulted him as they were hanging out. *Id.* at 1348. This involved several older members beating Mr. Rice "as hard as they [could]" to determine if he had "heart." *Id.* at 1349.

4

Bloods member Jonathan Cade testified that he started committing crimes with Bloods members at around age 14, just from "mimicking what other people was doing (sic)." *Id.* at 1623. A common theme from each of the Bloods member who testified at trial was that as young children they wanted to be like the Bloods, to emulate them. The Bloods clearly follow an age-old marketing technique: targeting impressionable children. Their presence has swept up untold numbers of South Minneapolis children for generations and will continue without adequate deterrence.

**b. Drug trafficking**

All three members of the Bloods who testified for the government in this trial spoke about the wanton drug trafficking that the Bloods perpetuate within their territory. William Blair listed several corners where Bloods sold drugs in the decades he was in the gang. Trans. at 291. Jamal Rice testified that he sold drugs from the age of 18 to the day he was arrested on his current charge. *Id.* at 1356-57. Mr. Rice and Bloods member Andrew Noble sold fentanyl in broad daylight at George Floyd Square. *See*, *e.g.* Gov't's Exhibit 304. Jonathan Cade testified that he started selling drugs with Bloods members at age 14. Trans. at 1622-23. Like Mr. Rice, Mr. Cade sold fentanyl to an undercover informant in broad daylight at George Floyd Square. *See, e.g.,* Gov't's Exhibit 304. Mr. Cade acknowledged that he sold fentanyl daily in George Floyd Square from 2020 to 2022. Gov't's Exhibit 196 at 11. He

5

estimated he sold over 25 kilograms of cocaine and nearly 1.5 kilograms of fentanyl in his years as a Bloods member. *Id.* at 13.

These were merely three members of the gang, and they were far from the only Bloods members were selling drugs daily throughout their territory over the decades the gang has held sway in South Minneapolis. Trans. at 291, 1756. For decades, the Bloods have made their money by flooding South Minneapolis with a tidal wave of drugs, poisoning its residents for their own gain. A significant sentence is necessary in this case to protect the public and deter further criminal activity by the Bloods gang.

### c. Violence

To maintain their drug-fueled income, the Bloods must avoid competition and prosecution. They do this by constantly burnishing their reputation for violence. William Blair testified that he and other Bloods sold within their territory because they had "protection" in the form of "guns" and "other homies." Trans. at 290. Jonathan Cade testified that the mere presence of other Bloods within their territory made him "safer" selling drugs. *Id.* at 1756. Anyone with ill intentions would "know we Bloods, they know we tote guns, know we violent" so they would not "be too likely to try anything." *Id.* The Bloods' reputation for gun violence allows them to sell such a high volume of drugs at will within their territory. That is why the gang puts such an emphasis on members' willingness to fight with opposition gang members.

6

Jonathan Cade described at least six different instances in which he shot at rival gang members and testified that he has been involved in "maybe 15 or more." Trans. at 1745; Gov't's Exhibit 196 at 11-12. He testified that these shootings involved firing upon rival gang members who were in Bloods territory to "get them up out the neighborhood," as well as going into rival gang territory looking for targets to shoot. *Id.* at 1742-1745. Jamal Rice, with more experience in the gang, testified that he's seen Bloods shoot at rival gang members "[a]t least 50" times. *Id.* at 1354. This trial proved in great detail how the Bloods murdered rival gang members Marcus Banks and Rayshawn Brown.

Lt. Adam Lepinski testified that this violence affects the entire South Minneapolis community. He spoke about the difficulty he had in his many years investigating crime in the neighborhood, how reticent witnesses were to come forward for fear of retaliation, how hard it could be to obtain justice for victims of the Bloods' violence. *Id.* at 1840-1841. Lt. Lepinski also spoke about his work with informants within the gang and how critical it was to protect their identities so that they would not face retaliation from within their own gang. *Id.* at 1833. He also spoke about how the Bloods could "do whatever they wanted" in George Floyd Square when MPD was kept out after 2020. *Id.* William Blair confirmed Lt. Lepinski's experience when he said that Bloods members who speak to law enforcement or testify at trial face "death." *Id.* at

7

262. He spoke about a friend of his, "X," who was killed for suspected his suspected cooperation. *Id.* A Bloods member shot his car "about 20 times with his son in the back seat." *Id.* Jamal Rice and Jonathan Cade both confirmed that they understood that "snitching" to law enforcement would get a Bloods member killed. *Id.* at 1355 and 1728.

The Bloods' drug trafficking empire within South Minneapolis rests on a foundation of threats and violence. Without this regime of retaliation and destruction, Bloods could not sell narcotics in broad daylight or intimidate their community with such audacity. And this regime of violence is where the defendant made his substantial contributions to the enterprise. Only a sentence of life in prison can adequately address the harm done by the Bloods gang. Anything less will only embolden the Bloods to continue their decades of criminal activity without fear of proper consequence.

### III. The Defendant's Decades of Criminal Conduct

Michael Burrell's history of gun violence dates back 26 years, to his conviction for aggravated robbery in 1999 in which he burst into the victim's home with a group of men, held the victim at gunpoint, pistol-whipped him, and robbed him. PSR ¶ 64. Burrell was sentenced to 44 months' imprisonment; it was during this stint that Burrell posed for a photograph in red—the color of the Bloods gang—with Bloods member William Blair. Gov't Exhibit 49; Testimony of William Blair, Trial Transcript ("Trans.") at 300-301. Burrell was

released from prison in June 2001 and in August 2002, committed a near-identical offense. PSR ¶ 65. Burrell and a group of men ambushed the victim outside his home, assaulted him, dragged the victim into his own home at gunpoint, and demanded money and drugs. *Id*. Burrell Then forced the victim into a vehicle to go obtain more money and drugs, at which point Burrell held the gun to the victim's head and said, "I'm fitting to kill you!" *Id*. Burrell did this while on supervised release from his prior home-invasion gunpoint robbery. PSR ¶ 64. For this second home invasion, Burrell received a sentence of 60 months, after which he accrued three supervised release violations and eventually served the full term of his sentence, which included his failure to refrain from association with prohibited "clubs, groups, or organizations." *Id*. Burrell was released from that sentence on September 30, 2007, and was quickly convicted of a drug offense that occurred less than two months later on November 2, 2007. PSR ¶ 65-66. He was again sentenced to prison, and this time he did not wait until his release to commit a new offense: he was convicted of introducing and selling narcotics in his MN DOC facility in August 2009. PSR ¶ 68.

Then, after a series of minor offenses, Burrell was convicted in 2016 of a first-degree drug offense in which law enforcement seized 25.6 grams of heroin packaged for sale, a scale, cash, and six cell phones from his vehicle, and another cell phone and $6,000 cash from his person. PSR ¶ 79. Burrell received

9

a 125-month sentence and was released in August 2019. *Id.* He quickly absconded from supervision in January 2020, just after he was arrested with cash, heroin, cocaine—all packaged for sale—and a firearm with an extended magazine loaded with 31 rounds, one of which was in the chamber. PSR ¶ 25; Testimony of MPD Officer Dante Dean, Trans. at 1425-1427. At the time of this arrest, Burrell was also in violation of his requirement to register as a predatory offender, a result of his home invasion conviction described above. PSR ¶ 25. This case was inexplicably never charged by the Hennepin County Attorney's Office but was described in detail during this trial by the arresting officer, 29-year MPD veteran Dante Dean. Trans. at 1420-1443.

Finally on June 14, 2020, just months after being arrested in possession of multiple narcotics and a firearm with an outrageous number of rounds, while he was a fugitive from supervision, he assaulted Isaac Hodge and fired several shots at him, setting off a gunfight that led to the murder of Marcus Banks, the basis of his conviction in this case. Ten days after the murder of Marcus Banks, Burrell was arrested with a .45 caliber gun, cash, and 77 grams of cocaine—as usual, packaged for sale. PSR ¶ 81.

### IV. The Murder of Marcus Banks

On June 14, 2020, Defendant Burrell and a group of Bloods set off a gunfight outside a crowded bar that led to the murder of Marcus Banks. While at the Broadway Pub and Grille in North Minneapolis, Burrell, along with

fellow Bloods Zachary Robinson and co-defendant Desean Solomon, saw known gang rival Isaac Hodge, who testified for the prosecution in Burrell's brother Myon's murder trial. Gov't's Exhibit 223; Testimony of Jonathan Cade, Trans. at 1631-1632. After ominously circling Hodge, the group of Bloods entered the bathroom, where Hodge unwittingly followed a few minutes later. Gov't's Exhibit 223. The group assaulted Hodge without provocation inside the bathroom, and Hodge emerged in tattered clothing about a minute later. Exhibit 223. In his PSR objections, Burrell admits—despite his protestations at trial—that this "scuffle" was related to the case involving his brother. PSR Addendum ¶ 3.

After the unprovoked assault inside the bar based on a years-old gang feud, Burrell and Hodge left and confronted each other outside, with Burrell eventually ambushing Hodge from behind a parked car, firing multiple shots at close range with bystanders all around. Gov't's Exhibit 223. This led to Solomon, Robinson, and many others coming outside, setting off a firefight with over 100 shots being fired outside the bar as bystanders fled in fear. Gov't's Exhibit 223; Testimony of Sgt. James Jensen, Trans. at 915. Burrell knew this gunfight was coming before he ever assaulted Hodge; bar surveillance showed him walking to his vehicle (a familiar sight in each of the murders in this trial), entering for a moment, and then returning to the bar. Gov't's Exhibit 223.

11

Burrell knew exactly what would happen once he and the other Bloods assaulted Hodge, and he was prepared. He cannot credibly claim, as he did at trial and assuredly will at sentencing, that his actions were separate from the murder of Marcus Banks. His attack on Hodge in the bathroom with other Bloods, enforcing an age-old gang prohibition against "snitching," and his attempt to shoot Hodge outside the bar directly caused the gunfight that cost Marcus Banks his life. Robinson and Solomon ran from the bar with their guns out the moment they heard gunfire outside; they knew precisely what had happened and who had been shooting. Gov't's Exhibit 223. And they did what Bloods members do—they rushed outside and shot at rival gang members, including Marcus Banks.

## CONCLUSION

Burrell's criminal career with the Bloods spans 26 documented years of gun violence and drug sales. His attempt to claim that his actions were not gang-related or to avoid responsibility for shooting at Isaac Hodge simply does not square with the incontrovertible evidence in this case. He assaulted Hodge without provocation, then shot at him outside the bar, knowing full well his Bloods compatriots would join in the shooting. He has had no meaningful span of time without a significant gun or drug-related conviction. There is no reasonable argument that Michael Burrell is now, after two decades of unabated violent crime, ready to change. The only reasonable sentence is one

12

that will incapacitate him for the foreseeable future, while still allowing him the opportunity to one day rejoin society.

The government respectfully asks that the Court sentence Michael Allen Burrell to a term of 384 months, or 32 years, imprisonment. This sentence is sufficient, but not greater than necessary, to incapacitate and deter Burrell from future criminal conduct, protect the public, and deter the Bloods enterprise from doing any further harm to the South Minneapolis community.

Dated: May 15, 2025           Respectfully submitted,

                              LISA D. KIRKPATRICK
                              Acting United States Attorney


                              */Kristian Weir*
                              KRISTIAN WEIR
                              CAMPBELL WARNER
                              Assistant U.S. Attorneys